**W. Ruth MULLINS and Johnce Mullins, Jr., Appellants–Defendants,**

v.

**PARKVIEW HOSPITAL, INC., Preferred Anesthesia Consultants, Kathryn B. Carboneau, M.D., University of St. Francis of Fort Wayne, Indiana, Inc., Larea VanHoey, Fort Wayne OB/GYN Consultants, and Marvin E. Eastlund, M.D., Appellees–Plaintiffs.**

No. 02A04–0412–CV–671.

Court of Appeals of Indiana.

June 30, 2005.

---

Sherrill Wm. Colvin, Lori W. Jansen, Haller & Colvin, P.C., Fort Wayne, IN, Attorneys for Appellants.

Edward L. Murphy, Stephen J. Harants, Miller Murphy & Miller, Fort Wayne, IN, Attorneys for Appellees Marvin E. Eastlund, M.D. and Fort Wayne OB/GYN Consultants.

Milford M. Miller, Miller Murphy & Miller, Fort Wayne, IN, Attorney for Appellees Kathryn B. Carboneau, M.D. and Preferred Anesthesia Consultants, P.C.

Mark A. Baeverstad, Peggy A. Carlisle, Rothberg Logan & Warsco LLP, Fort Wayne, IN, Attorneys for Parkview Hospital, Inc.

Cathleen M. Shrader, John M. Clifton, Jr., Barrett & McNagny LLP, Fort Wayne, IN, Attorneys for University of Saint Francis of Fort Wayne, Indiana, Inc. and Larea VanHoey.

**OPINION**

BAKER, J.

Appellants-plaintiffs W. Ruth Mullins (Ruth) and her husband, Johnce Mullins, Jr. (collectively, the Mullinses), appeal from the trial court's summary judgment order in favor of appellees-defendants Parkview Hospital, Inc. (Parkview), Preferred Anesthesia Consultants, P.C., Kathryn B. Carboneau, M.D., University of St. Francis of Fort Wayne, Indiana, Inc. (St. Francis), Larea VanHoey, Fort Wayne OB/GYN Consultants, LLC, and Marvin E. Eastlund, M.D. Specifically, the Mul-

linses contend that the trial court erred in: (1) failing to find that VanHoey committed a battery upon Ruth; (2) finding that expert testimony was necessary regarding the issue of informed consent; (3) finding that the Mullinses were required to prove that a lacerated esophagus was not a possible complication of surgery; (4) finding that the contractual agreements between Parkview and St. Francis did not establish their mutual liability to the Mullinses; and (5) deeming admitted certain of the Mullinses' responses to requests for admission. Finding, among other things, that the Mullinses have stated claims for battery against VanHoey and Drs. Eastlund and Carboneau and their respective employers, we affirm in part and reverse in part.

## FACTS

Ruth entered Parkview, a teaching hospital, on December 4, 2000, for hysterectomy surgery to be performed by her physician, Dr. Eastlund.[1] On November 14, 2000, Ruth and Dr. Eastlund met to discuss the surgery. Ruth explained to Dr. Eastlund that she was a very private person and did not want any individuals in the operating room other than absolutely necessary medical personnel. She also refused to agree to any pictures or videotapes being taken of her surgery. Ruth later met with one of Dr. Eastlund's nurses to sign his informed consent form, and she crossed out and refused to consent to the following paragraphs:

I consent to the presence of healthcare learners.

I consent to the photography or videotaping of the surgical, diagnostic, and/or medical procedure to be performed providing my name and identity is not revealed.

Appellant's App. p. 352.

On the day of her surgery, Ruth met with her anesthesiologist, Dr. Carboneau, before the procedure had begun. According to Ruth, she asked Dr. Carboneau if she would personally be handling the anesthetic procedures, and the doctor answered, "Yes." Appellants' App. p. 352. Dr. Carboneau denies ever telling Ruth that she "would be personally performing each separate task leading up to and involved during the administration of anesthesia agents." Carboneau's Br. p. 3. Ruth signed Dr. Carboneau's consent form, which stated that only Dr. Carboneau "or a physician privileged to practice anesthesia" would administer anesthesia to Ruth. Appellants' App. p. 357. Dr. Carboneau's consent form does not mention the presence or participation of learners, and she admits that during their meeting, she never mentioned that possibility to Ruth.

Ruth was under sedation and unconscious when VanHoey, a student studying for certification as an emergency medical technician (EMT) at St. Francis, entered the surgical room. As a part of her certification program, VanHoey was required to successfully complete several intubations[2]

1. Neither Dr. Eastlund nor Dr. Carboneau, Ruth's anesthesiologist, are employed by or agents of Parkview. Dr. Eastlund is employed by Fort Wayne OB/GYN Consultants, and Dr. Carboneau is employed by Preferred Anesthesia Consultants.

   We note our surprise that the same law firm is representing both Dr. Eastlund and his employer, and Dr. Carboneau and her employer, albeit by filing separate briefs for both. It is apparent to us that Dr. Eastlund and Dr. Carboneau have potentially divergent interests at stake in this case, and we can easily imagine a scenario in which a conflict of interest would arise.

2. Intubation is a procedure that is performed as part of general anesthesia to make certain that a sedated person's airway remains open. It is accomplished by inserting a tube through the patient's mouth and throat into the tra-

on living patients. Although VanHoey had previously practiced the procedure on mannequins, the day of Ruth's surgery was the first time that VanHoey had ever attempted live intubations.

St. Francis and Parkview had contracted with each other for St. Francis students to be trained in various medical procedures, including intubations, while under the supervision of a Parkview employee. Per their agreement, St. Francis provided medical malpractice insurance for students and faculty, and Parkview retained ultimate responsibility and authority for each patient's care. Appellants' App. p. 412–14, 429. Generally, the Parkview employee, called a "preceptor," walked into an operating suite prior to the start of a surgical procedure and asked if the patient was a candidate on which the student could practice the intubation technique. If the anesthesiologist agreed, the preceptor and the student learner entered the operating room, where the student would attempt the intubation procedure. The patient was unaware of the student's presence in the room and participation in the procedure. While performing the procedure, the student was supervised by the anesthesiologist, not the preceptor or any other Parkview employee.

When VanHoey entered Ruth's operating room, she was accompanied by her preceptor, Colin White. White asked Dr. Carboneau if VanHoey could practice the intubation procedure on Ruth, Dr. Carboneau consented, and Dr. Eastlund, who was present in the operating room, voiced no objections. VanHoey made two attempts to intubate Ruth using a laryngoscope. After her second attempt, both Dr. Carboneau and Dr. Eastlund saw blood on the type of the laryngoscope, but apparently, the presence of blood on the laryn-goscope following intubation is not unusual, and neither doctor was alarmed at the time. After VanHoey failed to intubate Ruth successfully, Dr. Carboneau performed the procedure and completed Ruth's anesthesia.

On December 6, 2000, two days after Ruth's hysterectomy, the attending nurse noticed that Ruth's face and neck were beginning to swell. After running some tests, Dr. Carboneau, Dr. Eastlund, and Dr. John Csicsko, a cardiovascular surgeon, met with Ruth to explain that Van-Hoey had lacerated Ruth's esophagus when she attempted to perform the intubation procedure. The doctors explained to Ruth that she needed to undergo another surgical procedure to repair the damage to her esophagus. Although Ruth was reluctant to undergo another surgical procedure because she had just undergone the hysterectomy, the doctors strongly encouraged her to have the procedure that day because waiting until the next day could have been fatal. Thus, on the same day, Ruth had surgery to repair her esophagus, and as a result of this second procedure, she had to remain in the hospital for over a month until her dismissal on January 5, 2001.

On December 3, 2002, Ruth filed a complaint against the appellees-defendants, alleging that they went beyond the scope of her informed consent, that they failed to comply with the appropriate standard of care, and that their negligence was the proximate cause of her injuries. A medical review panel (MRP) was convened pursuant to the Indiana Malpractice Act, and on June 7, 2004, it concluded that Dr. Eastlund, Dr. Carboneau, and Parkview complied with the appropriate standard of

chea. There is a short period of time—about three minutes—during which the intubation

may be completed safely. Appellants' App. p. 19.

care.[3]

The appellees-defendants filed their motions for summary judgment during June and July 2004. Parkview's motion, which was eventually joined by Dr. Eastlund and Fort Wayne OB/GYN Consultants, alleged that the MRP had found unanimously in favor of all defendants and that the Mullinses had presented no expert testimony creating an issue of fact as to the defendants' liability. The same arguments formed the basis of Dr. Carboneau and Preferred Anesthesia Consultants' motion. St. Francis and VanHoey's motion, eventually joined by Parkview, was based upon requests for admission deemed admitted by the trial court. After conducting a hearing on the motions for summary judgment, the trial court granted summary judgment in favor of all appellees-defendants on November 19, 2004. The Mullinses now appeal.

## DISCUSSION AND DECISION

As we consider the Mullinses' arguments, we note that summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[4] *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning,* 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the

nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

### I. Battery Claims

The Mullinses first argue that the trial court erred in dismissing their case without finding that a battery had been committed on Ruth by VanHoey. Civil battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent." W. Keeton, *Prosser and Keeton on the Law of Tort,* § 9 (5th ed. 1984).

In response, St. Francis and VanHoey first contend that the Mullinses' complaint does not plead facts sufficient to give rise to an actionable claim for battery. Specifically, they contend that the Mullinses failed to allege that VanHoey acted with the requisite intent.

As we consider this argument, we note that Indiana is a notice pleading

---

3. The MRP made no determination regarding VanHoey or St. Francis because they are not health care providers, and, as a result, they are not covered by the Indiana Medical Malpractice Act. *See* Ind.Code § 34–18–2–14.

4. We note that although there were numerous briefs filed in this case, only Parkview and St. Francis set forth the standard of review for summary judgment. Parkview Br. p. 10. We direct the Mullinses to Indiana Appellate Rule 46(A)(8)(b), which requires the appellant to include the applicable standard(s) of review.

state. Ind. Trial Rule 8(A). Thus, a plaintiff is only required to plead the operative facts involved in the litigation and need not recite in detail all the facts upon which the claim is based. *McQueen v. Fayette County Sch. Corp.*, 711 N.E.2d 62, 65 (Ind. Ct.App.1999), *trans. denied.* Stated differently, the plaintiff is only required to provide a clean and concise statement that will put the defendants on notice as to what has taken place and the theory that the plaintiff plans to pursue. *Id.* For our purposes, a complaint is sufficient if it states any set of allegations, no matter how unartfully pleaded, upon which the trial court could have granted relief. *Id.*

■ The Mullinses' complaint includes the following facts: (1) Ruth was admitted to Parkview to undergo a hysterectomy under the care of Drs. Eastlund and Carboneau; (2) Ruth indicated on Dr. Eastlund's consent form that she was specifically withholding consent to the presence of healthcare learners in her operating room; (3) Dr. Carboneau's consent form indicated that only Dr. Carboneau or another physician privileged to practice anesthesia would be providing Ruth's anesthesia care; (4) VanHoey—a healthcare learner—was present in Ruth's operating room; (5) VanHoey attempted to intubate Ruth; (6) Ruth suffered an esophageal perforation during her intubation; (7) Ruth suffered and continued to suffer permanent injuries and damages as a result of the intubation. Appellants' App. p. 27–33.

It is clear from the Mullinses' complaint that they are claiming not only that the intubation was performed negligently, but that it was performed *at all,* given her explicit instructions to her doctors that no healthcare learners were to be present and that only a physician should be administering her anesthesia care. The complaint sufficiently articulates a harmful or offensive contact—intubation performed by VanHoey, a student learner—that resulted from an act intended to cause her to suffer the contact—use of equipment to perform the intubation and failure of Ruth's doctors to object to VanHoey's presence and participation. Accordingly, given our liberal notice pleading standard, we are persuaded that the Mullinses have sufficiently stated a claim for battery not only against VanHoey, but also against Drs. Eastlund and Carboneau and their respective employers. *See Kemezy v. Peters,* 622 N.E.2d 1296, 1298 (Ind.1993) (holding that employee's tortious act may fall within the scope of his employment and render employer vicariously liable under certain circumstances).

St. Francis and VanHoey next point to a line of cases holding that claims based on the doctrine of informed consent sound in negligence and medical malpractice, not battery. *See Bowman v. Beghin,* 713 N.E.2d 913, 916 (Ind.Ct.App.1999). We find our opinion in *Cacdac v. West,* 705 N.E.2d 506, 511–12 (Ind.Ct.App.1999), *trans. dismissed,* to be instructive. In *Cacdac,* we considered whether a plaintiff who alleged that her surgeon fraudulently induced her to undergo surgery had stated a claim for battery. We noted that "the complete failure of a physician to obtain informed consent before proceeding with surgery is more appropriately characterized as a battery, not negligence." *Id.* at 511. We further emphasized that if a surgeon exceeds the scope of her patient's consent,

> "[t]he question is not whether [the doctor's] surgical technique was compatible with the standard of care for doctors in that area. The success or failure of the operation is immaterial to the battery claim. Had the operation been successful, [the plaintiff] would still be entitled to damages if she proved the elements of her claim."

*Id.* at 511–12 (quoting *Boruff v. Jesseph,* 576 N.E.2d 1297, 1299 (Ind.Ct.App.1991) (Barteau, J., dissenting)). The *Cacdac* court concluded that it could not draw a "bright-line rule" because a claim based on the failure to obtain informed consent has elements of both battery and negligence. *Id.* at 512. Ultimately, we held that "an informed consent procedure that falls far short of that mandated by the relevant standard of care could, in some circumstances, support such a claim [for battery]. Examples of such circumstances include gross negligence, fraud, or the intentional withholding of information." *Id.* We are persuaded that Ruth's situation is akin to that contemplated by the *Cacdac* court. This is not a failure of one of Ruth's doctors to inform her adequately of all of the risks involved with her imminent surgery. Indeed, this is not a mere failure to give informed consent—Ruth explicitly withheld consent for this procedure altogether. While this scenario certainly lends itself to a medical malpractice action, it also goes beyond malpractice and presents a valid claim for battery against Van-Hoey, Dr. Eastlund and his employer, and Dr. Carboneau and her employer.

## II. Negligence Claims

### A. Expert Testimony

The Mullinses next argue that the trial court erred in concluding that expert testimony was necessary regarding the issue of informed consent. Specifically, they contend that the consent forms and her claims require only common sense—not a medical degree—to understand and interpret. The appellees-defendants respond by arguing that: (1) the only reason that the Mullinses are now making this argument is because they were unable to produce an expert who was critical of the appellees-defendants before the response deadline; and (2) the underlying issues involve complicated questions about the interrelationship of numerous parties in a medical setting, multiple consent forms, and the practices and procedures of St. Francis and Parkview, which are not within the common knowledge of a lay person.

■ To make a successful medical malpractice claim, plaintiff must establish the following elements: (1) the healthcare provider owed a duty to the plaintiff; (2) the healthcare provider breached its duty by allowing his conduct to fall below the standard of care; and (3) the healthcare provider's breach of duty proximately caused the plaintiff to suffer compensable injury. *Perry v. Driehorst,* 808 N.E.2d 765, 768 (Ind.Ct.App.2004), *trans. denied.*

### 1. The Mullinses' Expert

The appellees-defendants first point to the affidavit (Baylis Affidavit) of the Mullinses' own expert, Dr. Barry Baylis, which, at first glance, seems to absolve some of them of liability:

I am a Board Certified Anesthesiologist with 24 years' experience who has administered/supervised administration of Anesthesia to at least 10,000 patients without any medical malpractice. I have thoroughly reviewed the entire chart of Mrs. Ruth Mullins pertaining to her hospitalization beginning December 4, 2000 for vaginal hysterectomy, which was complicated by a second surgery for a symptomatic esophageal tear. *I find no fault with the medical care administered by Dr. Eastlund,* Dr. Westfall, Dr. Zehr, Dr. Csicsko and Dr. Klee. But I do think there is a medical-legal issue when Dr. Carboneau allowed an EMS student (a learner) to attempt intubation more than one time which resulted in esophageal perforation. This is medically legally significant and may even constitute criminal assault when in the consent for surgery dated 11–14–00 she

crossed out that area of the consent which stated "I consent to the presence of healthcare learners." The consent signed 12–4–00 did not have any mention of presence of learners but it did say "I understand that my anesthesia care will be given to me by the undersigned or a physician privileged to practice anesthesia." Clearly this implies that students or learners are not permitted since they are not privileged to practice anesthesia. Thus when coupled with the original consent of 11–14–00 the presence of the student is not allowed, much less practice on the patient by that unprivileged individual. This as I stated above may rise to criminal assault.

Appellants' App. p. 433 (emphasis added). Dr. Eastlund argues that Ruth's own expert found no fault with his performance, and Parkview points out that Baylis is silent as to an opinion regarding its role in the situation. Dr. Carboneau contends that because the Mullinses have not argued that the Baylis Affidavit created a genuine issue of material fact with respect to her liability and that of Preferred Anesthesia, they have waived the argument for our review.

◼ As to Dr. Eastlund and his employer, the Baylis Affidavit makes two relevant conclusions: first, that Dr. Eastlund performed his medical tasks—i.e., the hysterectomy—appropriately; second, that there is a medical issue with respect to VanHoey being permitted to perform the intubation, especially in light of Ruth's notation on Dr. Eastlund's consent form. Dr. Baylis clearly determined that this intubation should not have been performed. That the affidavit also notes that Dr. Eastlund appropriately performed Ruth's hysterectomy is of no moment inasmuch as she is not claiming that he committed malpractice during that procedure. To the contrary, the Mullinses contend

that because Dr. Eastlund agreed that he would not permit any student learners to be present in the operating room, he should have stopped Dr. Carboneau from permitting VanHoey to attempt the intubation procedure. Dr. Baylis agrees with them, albeit in a somewhat inarticulate fashion. It is our belief that the Baylis Affidavit creates a question of material fact as to whether Dr. Eastlund had an obligation to prevent VanHoey from entering the operating room and attempting the intubation. Accordingly, the trial court erred in granting summary judgment for Dr. Eastlund and Fort Wayne OB/GYN Consultants.

◼ Dr. Baylis also took issue with Dr. Carboneau's conduct. Dr. Carboneau argues that the Mullinses have waived any argument that the Baylis Affidavit creates a genuine issue of material fact because they did not raise the argument in their opening appellate brief. Carboneau Br. p. 6. The record reveals that while, surprisingly, the Mullinses did not include the argument in their opening appellate brief, they did include the argument in their motion opposing Carboneau's summary judgment motion before the trial court. Appellants' App. p. 332–33.

To resolve this issue, we refer to our standard of review on a summary judgment motion. As noted above, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning*, 754 N.E.2d at 909. If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.* We must carefully scrutinize the decision to grant summary judgment to ensure that a party was not improperly prevented from having its day in court. *Id.*

◼ Although the Mullinses did not raise the argument with respect to the Baylis Affidavit and Dr. Carboneau in

their opening appellate brief, they did include it before the trial court, and they have, therefore, not waived it on that basis. Additionally, there is no unfair surprise to Dr. Carboneau because she has previously encountered this argument. We conclude, therefore, that because we must resolve all doubts as to the existence of material issues of fact against Dr. Carboneau, and because we believe that in light of the Baylis Affidavit a jury could have reasonably found against Dr. Carboneau, the Mullinses have not waived the argument. Accordingly, it is our determination that the Baylis Affidavit creates a genuine issue of material fact as to the liability of Dr. Carboneau and her employer, Preferred Anesthesia Consultants, and we reverse the trial court's order granting summary judgment in their favor.

As to Parkview, the Baylis Affidavit is silent. Therefore, we must determine whether the Mullinses were obliged to present expert testimony to contradict the MRP's finding that Parkview complied with the appropriate standard of care to avoid summary judgment against them.

### 2. Common Knowledge Exception

The Mullinses argue that this situation falls into the common knowledge exception to the general rule that would otherwise require them to present expert testimony in opposition to the finding of the MRP.

■ As we consider this argument, we note that within twenty days after the filing of a medical malpractice complaint, any party may request the formation of an MRP. Ind.Code § 34–18–10–2. The MRP's responsibilities are as follows:

(a) The panel has the sole duty to express the panel's expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care charged in the complaint.

(b) After reviewing all evidence and after any examination of the panel by counsel representing either party, the panel shall, within thirty (30) days, give one (1) or more of the following expert opinions, which must be in writing and signed by the panelists:

(1) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.

(2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.

(3) There is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury.

(4) The conduct complained of was or was not a factor of the resultant damages. If so, whether the plaintiff suffered:

(A) any disability and the extent and duration of the disability; and

(B) any permanent impairment and the percentage of the impairment.

I.C. § 34–18–10–22(a). When an MRP has reached a unanimous opinion that a healthcare provider did not breach the applicable standard of care, as here, summary judgment is warranted unless the plaintiff comes forward with competent expert testimony that the healthcare provider's care fell below the applicable standard. *Robertson v. Bond*, 779 N.E.2d 1245, 1249 (Ind.Ct.App.2002), *trans. denied.*

■ While generally, to avoid summary judgment the plaintiff must refute the MRP's decision by presenting its own supporting expert testimony regarding the standard of care, the Mullinses point to a

line of cases describing a common knowledge exception to the general rule. *Whyde v. Czarkowski,* 659 N.E.2d 625, 628 (Ind.Ct.App.1995), *trans. denied.* This exception applies when " 'the complained-of conduct is so obviously substandard that one need not possess medical expertise in order to recognize the breach.' " *Id.* (quoting *Malooley v. McIntyre,* 597 N.E.2d 314, 319 (Ind.Ct.App.1992)). This court recently affirmed the common knowledge exception:

> Failure to provide expert testimony will usually subject the plaintiff's claim to summary disposition. However, a plaintiff is not required to present expert testimony in those cases where deviation from the standard of care is a matter commonly known to lay persons. This exception is based upon the doctrine if [sic] res ipsa loquitur where the deficiency of the physician's conduct "speaks for itself."

*Perry,* 808 N.E.2d at 768 (quoting *Whyde,* 659 N.E.2d at 627).

The Mullinses contend that this case involves basic informed consent forms and alleged oral promises made to Ruth, arguing that those issues "require only a modicum of common sense to understand—certainly not a medical degree nor an expert witness to explain." Appellants' Br. p. 10. According to the Mullinses, Ruth's story is very simple: she explained to Dr. Eastlund that she wanted only medically necessary personnel—and no student learners—to be present in the operating room during her surgery, making a notation to that effect on his consent form; she explained to Dr. Carboneau that she only wanted a doctor to perform her anesthetic procedures, and Dr. Carboneau's consent form expressly stated that only she or another physician would provide Ruth's anesthesia care; Dr. Carboneau permitted an EMT-in-training to attempt Ruth's intubation,

and Dr. Eastlund, who was present in the operating room at the time, did not object; VanHoey lacerated Ruth's esophagus, and she suffered injuries as a result.

Parkview paints a far more complicated picture. It explained the situation very well as it relates to the hospital:

> At issue was the hospital's practice of having the preceptor rely upon the anesthesiologist to determine if a patient was an appropriate candidate for having a student practice intubation or whether the hospital should have reviewed the consents on its own and made an independent determination. This is a standard of care issue beyond the scope of a layperson's knowledge and one that required medical expert evaluation and testimony.
>
>    *  *  *
>
> A lay person cannot comprehend or make a determination as to what is involved with monitoring, supervising, establishing, and following procedures in this context without the testimony of medical experts. Not being familiar with hospital policy and procedure, nor the inner workings of a teaching hospital which necessarily has healthcare learners present, a lay person lacks the requisite understanding necessary to dissect and render an informed opinion on such topics. The foregoing are all standard of care issues beyond the common knowledge and skill of an average person and, as such, require expert testimony to create a fact issue as to whether Parkview Hospital's conduct fell below the applicable standard of care.

Parkview Br. p. 17–18.

███ We are persuaded that whether or not Parkview complied with the appropriate standard of care presents issues that are sufficiently complicated and beyond the scope of knowledge of the aver-

age lay person. An average layperson is almost certainly not familiar with the policies and procedures of a teaching hospital and the interplay between and among preceptors, student learners, doctors, and patients. Accordingly, to avoid summary judgment, the Mullinses were required to present expert testimony regarding Parkview's liability to contradict the MRP's conclusion that Parkview behaved appropriately. The Baylis Affidavit is silent as to Parkview, and as a result the Mullinses have presented no expert testimony as to its liability. The trial court, therefore, appropriately granted summary judgment in favor of Parkview.[5]

### B. Causation [6]

■ The Mullinses next argue that the trial court erred in finding that they were required to establish a causal relationship between the appellees-defendants' alleged breach of the applicable standard of care and her lacerated esophagus. Specifically, she contends that because she is arguing that they breached the informed consent forms, she need prove only that she did not receive the care to which she consented on the forms, and need not prove that a lacerated esophagus could not be a normal complication during the administration of anesthesia.

The Mullinses agree that the following are the elements that must be proved to sustain a claim of medical malpractice: (1) a duty owed to her by her doctor(s); (2) a breach of duty by the doctor(s) such that the doctor's conduct fell below the standard of care, and (3) compensable injury that was proximately caused by the breach of duty. Appellants' Br. p. 15; *see also Perry*, 808 N.E.2d at 768. Thus, to sustain a claim of negligence, according to the Mullinses' own brief, they must show that the breach proximately caused Ruth's injury. Accordingly, the trial court properly stated that it was incumbent upon the Mullinses to prove that the appellees-defendants breached the standard of care,[7] and that the breach caused Ruth's lacerated esophagus.

### C. St. Francis

The Mullinses contend that the trial court erred in failing to find that the con-

5. The Mullinses attempted—without requesting an extension of time—to file another expert affidavit that was, presumably, more in their favor, over a month after the deadline for their response to the motions for summary judgment had passed. They apparently offered no explanation as to its untimeliness. The trial court struck the affidavit because it was untimely, and the Mullinses contend that it was error to do so. There is ample authority holding that it is within the trial court's discretion whether to consider late-filed affidavits in response to a motion for summary judgment. *Winbush v. Mem'l Health Sys., Inc.*, 581 N.E.2d 1239, 1243 (Ind.1991); *Tannehill v. Reddy*, 633 N.E.2d 318, 320 (Ind.Ct. App.1994), *trans. denied*. The Mullinses offer no support for their argument that the trial court abused its discretion in striking the affidavit, and indeed, we can find no support for the argument in the record or in case law. Accordingly, we conclude that the trial court properly struck this affidavit.

6. The issues remaining with respect to the Mullinses' negligence claims are not relevant with regard to Parkview inasmuch as we have already determined that the trial court properly granted summary judgment in its favor.

7. The Mullinses also contend that the trial court erred in concluding that "a higher standard of care is applicable because [Ruth] specifically contracted by her consent to have only physicians and their fully trained personnel care for her." Appellants' App. p. 18–22. It is not clear to us exactly what the trial court meant by "a higher standard of care," but we direct the trial court to apply the usual standard of care appropriate to all medical malpractice/informed consent defendants to the appellees-defendants whose summary judgments we are reversing as to negligence.

tractual agreements between Parkview and St. Francis established St. Francis's liability to the Mullinses. Specifically, they argue that because St. Francis was contractually obligated to carry malpractice insurance on its student learners who spent time at Parkview, it contemplated being liable for the negligence of its students and "should be estopped from claiming no liability . . . ." Appellants' Br. p. 21.

■ We first note that the Mullinses cite to no legal authority whatsoever to support this argument, and we point to the well-settled authority that we will not consider an issue on appeal if the appellant has failed to present a cogent argument supported by authority and references to the record. Ind. Appellate Rule 46(A); *see also Shepherd v. Truex*, 819 N.E.2d 457, 463 (Ind.Ct.App.2004).

■ Even if we were to consider this argument, we agree with St. Francis that, taken to its logical conclusion, this contention leads to an absurd result: if we were to hold that St. Francis is estopped from denying liability based on the fact that it carried malpractice insurance, *any* business required to carry liability insurance would be prevented from defending against a negligence lawsuit, regardless of whether there was any negligence. Essentially, a business carrying liability insurance would be strictly liable for negligence, and plaintiffs would no longer have to prove the elements of their claim. Moreover, such a result is prohibited by Indiana Evidence Rule 411: "[e]vidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully." Because the contract between St. Francis and Parkview is the Mullinses' only argument in favor of

assigning liability to St. Francis, we conclude that the trial court acted appropriately in awarding summary judgment in favor of St. Francis.

### D. Requests for Admission

The Mullinses next argue that the trial court erred in deeming admitted certain requests for admission propounded by St. Francis and VanHoey. Specifically, they contend that their initial denials coupled with explanatory interrogatory responses were sufficient to appropriately deny the requests to admit. St. Francis and VanHoey based their motion for summary judgment on the deemed admissions.

■ As we consider this argument, we note that we review a trial court's determination on discovery matters for abuse of discretion. *Williams v. State*, 819 N.E.2d 381, 384 (Ind.Ct.App.2004), *trans. denied.*[8] For a trial court to abuse its discretion, its decision must be clearly erroneous and against the logic and effect of the facts of the case. *Id.* Because of the sensitive nature of discovery matters, the trial court's ruling is cloaked in a strong presumption of correctness on appeal. *Id.* Thus, we will affirm the ruling if it is sustainable on any legal basis in the record, even though this was not the reason enunciated by the trial court. *Id.* at 384–85.

VanHoey first argues that the Requests are now irrevocably admitted because the Mullinses failed to file a Trial Rule 36(B) motion to withdraw or amend the admissions. According to Trial Rule 36(B), "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." We note that we have previously concluded that " 'Trial

---

8. We note that the Mullinses again failed to include the appropriate standard of review for

discovery matters as required by Appellate Rule 46.

Rule 36(B) does not require a motion for relief under it to be denominated in any particular manner. Merely by challenging deemed admissions and asking for an extension of time to respond, a party satisfies the requirement of T.R. 36(B) that a party move to withdraw or amend deemed admissions.'" *Kerkhof v. Kerkhof,* 703 N.E.2d 1108, 1113 (Ind.Ct.App.1998) (quoting *Hanchar Indus. Waste Mgmt., Inc. v. Wayne Reclamation & Recycling, Inc.,* 418 N.E.2d 268, 271 n. 2 (Ind.Ct.App.1981) (Staton, J., concurring in part and dissenting in part)). Here, the Mullinses did not fail to meet the response deadline so they were not required to seek an extension. And although they did not explicitly call their challenge to the deemed admissions a "Rule 36(B) Motion to Withdraw," we believe that their challenge was sufficient to satisfy the requirements of Rule 36(B).

The Mullinses contend that they sufficiently denied all requests for admission in their initial responses and in follow-up responses to interrogatories. St. Francis and VanHoey counter by arguing that the Mullinses did not sufficiently deny the requests, and, as such, they were properly deemed admitted.

At issue are the Mullinses' responses to four requests for admission along with the companion responses to interrogatories.[9] Initially, we note that at no time did the Mullinses object to the requests or indicate that they could not respond because they had conducted a reasonable inquiry to obtain information or that doing so would be unreasonably burdensome. *See* Ind. Trial Rule 36(A).

■ Request for Admission Number 5 and its response read as follows:

*REQUEST FOR ADMISSION NO. 5:* At all times Defendant, Larea VanHoey, saw and attempted to intubate W. Ruth Mullins, on December 4, 2000, she was acting under and subject to the direction, control and supervision of Parkview Hospital, Kathryn Carboneau, M.D. and Marvin Eastlund, M.D.

*RESPONSE:* Denied. This legal conclusion has not been specifically answered by discovery.

Appellants' App. p. 49. When questioned further by St. Francis and VanHoey, the Mullinses provided the following answer to Interrogatory Number 2:

*INTERROGATORY NO. 2:* State in specific detail all facts relied upon by Plaintiffs to support the denial of Request for Admission Number 5 previously served on Plaintiffs.

*ANSWER:* Plaintiffs rely on the fact that no discovery has provided the answer to this legal conclusion. It is likely that further discovery will address this legal conclusion.

Appellants' App. p. 55. The Mullinses contend that testimony regarding the direction, control, and supervision exerted over VanHoey by each doctor "was unclear." Appellants' Br. p. 23. The trial court concluded that, while the Mullinses cited a need for further discovery, extensive discovery had already taken place, and they were unable to indicate to the trial court what future discovery would accomplish or why such discovery had not already been completed during the two-year litigation. In light of the facts that

---

9. In their brief, the Mullinses contend that the trial court erred in deeming admitted requests for admission 5, 6, 8, 9, 12, and 14. They make no further argument with respect to requests 6 and 12, and, accordingly, we will not consider those requests. *See* Ind. Appel-

late Rule 46(A)(8). Moreover, inasmuch as we have already determined that the trial court properly granted summary judgment in favor of St. Francis, we will only consider those requests that are relevant to VanHoey— 5, 9, and 14.

the litigation had been ongoing for two years, the depositions of both doctors, White, and VanHoey had already been completed, and the Mullinses could not specify to the trial court why further discovery would help them to respond to this Request, we cannot conclude that the trial court's decision was clearly erroneous.

■ Request for Admission Number 9 reads as follows:

> *REQUEST FOR ADMISSION NO. 9:* On December 4, 2000, Larea VanHoey did not breach any duty of care of Plaintiff, W. Ruth Mullins, at Parkview Hospital.
>
> *RESPONSE:* Denied.

Appellants' App. p. 50. When questioned further by St. Francis and VanHoey, the Mullinses provided the following answer to Interrogatory Number 5:

> *INTERROGATORY NO. 5:* State in specific detail all facts relied upon by Plaintiffs to support the denial of Request for Admission Number 9 previously served on Plaintiffs.
>
> *ANSWER:* Plaintiffs never agreed to participate in the training program conducted by St. Francis University of Fort Wayne. In addition, plaintiffs did not consent to allow a healthcare learner to be present during the operation, and did not consent to allow a healthcare learner to perform any medical procedure on Ruth Mullins. Larea VanHoey had a duty not to lacerate Ruth Mullins['s] esophagus.

Appellants' App. p. 55. It is apparent to us that the Mullinses intended their denial of this Request to rest on the fact that VanHoey performed the intubation at all. According to the Mullinses, as soon as VanHoey attempted to intubate Ruth, she breached a duty of care owed to Ruth because Ruth never consented to her presence in the first place. To deem this Request admitted based on a sufficient denial coupled with a sufficient answer to an interrogatory is to engage in word games, which we shall not do. We conclude, therefore, that the trial court erred in deeming this Request admitted.

■ Request for Admission Number 14 reads as follows:

> *REQUEST FOR ADMISSION NO. 14:* When Larea VanHoey left the operatory in which W. Ruth Mullins was a patient on December 4, 2000, no physician or other health care provider made any comment or accusation that Larea VanHoey had perforated the esophagus of W. Ruth Mullins.
>
> *RESPONSE:* Denied. Ruth Mullins was unconscious. The physicians did tell that as fact to Ruth Mullins and her family.

Appellants' App. p. 52. After further questioning from St. Francis and VanHoey, the Mullinses provided the following answer to Interrogatory Number 8:

> *INTERROGATORY NO. 8:* State in specific detail all facts relied upon by Plaintiffs to support the denial of Request for Admission Number 14 previously served on Plaintiffs.
>
> *ANSWER:* The only information on this subject that plaintiffs has [sic] is from the deposition testimony of Drs. Eastlund and Carboneau, Colin White and Larea VanHoey. Ruth Mullins was unconscious during the procedure and her husband was not present in the surgical suite. However, physicians later did tell that information to the plaintiffs.

Appellants' App. p. 56. The Mullinses could not be any plainer in their denial of this Request: Ruth was unconscious following her surgery, and there is, therefore, no way for her to know what statements the doctors did or did not make at that time regarding VanHoey's performance. To deem this Request admitted is to en-

**62**

gage in senseless hair-splitting, which we shall not do. Accordingly, we conclude that the trial court erred in deeming this Request admitted.

### CONCLUSION

In conclusion, we find as follows: (1) the Mullinses adequately stated a claim for battery against VanHoey, Dr. Eastlund, Fort Wayne OB/GYN Consultants, Dr. Carboneau, and Preferred Anesthesia Consultants; (2) the trial court properly granted summary judgment on the Mullinses' negligence claim in favor of Parkview; (3) the trial court erred in granting summary judgment on the Mullinses' negligence claim in favor of Dr. Carboneau, Preferred Anesthesia Consultants, Dr. Eastlund, and Fort Wayne OB/GYN Consultants; (4) the trial court properly required the Mullinses to prove that the complained-of breach was the proximate cause of their damages; (5) the trial court properly deemed admitted Request for Admission Number 5; and (6) the trial court improperly deemed admitted Requests for Admission Numbers 9 and 14.

The judgment of the trial court is reversed in part, affirmed in part, and remanded for proceedings consistent with this opinion.

KIRSCH, C.J., and BARNES, J., concur.